1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

SCHA BUCK LARSON,

                         Plaintiff,

    v.

RONALD BAILIFF, *et al.*,

                     Defendants.

Case No. 13-cv-2790-BAS(JLB)

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

**[ECF Nos. 179, 180, 181, 182]**

      Plaintiff Scha Buck Larson filed this Complaint against San Diego Police Sergeant Ronald Bailiff and Officers Andrew Ruiz, Richard Widner, Thomas Curran and Christopher Cummings, stemming from his arrest on November 19, 2011 and ensuing hospital stay on November 20, 2011.[1]

      Plaintiff alleges five counts of excessive force against four officers (Ruiz, Widner, Curran and Cummings) stemming from his November 19th arrest: Count One—excessive force under the Fourth Amendment; Count Two—excessive force

---

[1] Although the first names of some of these Officers were incorrectly listed in Plaintiff's Complaint, the names were later corrected on the docket.  (ECF No. 95.)

1  under the due process clause of the Fourteenth Amendment; Count Five—torture in

2  violation of Fourth Amendment; Count Six—torture in violation of due process

3  clause of Fourteenth Amendment; and Count Nine—conspiracy to use excessive

4  force and torture in violation of the Fourth Amendment.

5       Plaintiff alleges two counts specifically against Officer Widner for his actions

6  in supervising his police dog and being "indifferent to the excessive force / torture of

7  [his] K-9 maulings upon Plaintiff": Count Twelve—filed under the Fourth

8  Amendment and Count Thirteen—filed under the due process clause of the

9  Fourteenth Amendment.  And Plaintiff alleges two counts specifically against Sgt.

10  Bailiff for his "supervisory indifferen[ce] in formulating, conspiring and executing

11  the 'plan' to take Plaintiff into police custody utilizing the excessive force/torture"

12  by his subordinates:  Count Fourteen—filed under the Fourth Amendment and Count

13  Fifteen—filed under the due-process clause of the Fourteenth Amendment.

14       Plaintiff files two counts alleging fabrication of police reports: Count Eleven—

15  against the four officers for conspiring to fabricate police reports "to cover-up the

16  excessive force/torture"; and Count Sixteen—against Sgt. Bailiff for conspiring with

17  the other subordinate officers to fabricate police reports to cover up the excessive

18  force/torture.

19       The remaining five counts concern Plaintiff's hospitalization at Alvarado

20  Hospital.  Plaintiff claims that on November 20, 2011, Officer Ruiz used excessive

21  force when he "intravenously involuntarily intoxicat[ed] Plaintiff."  Hence, Plaintiff

22  files five counts against Officer Ruiz alone:  Count Three—for excessive force under

23  the Fourth Amendment; Count Four—for excessive force under the due process

24  clause of the Fourteenth Amendment; Count Seven—for torture under the Fourth

25  Amendment; Count Eight for torture under the due process clause of the Fourteen

26  Amendment; and Count Ten for conspiracy to "execute the plan to intravenously

27  intoxicate Plaintiff."

28  //

Defendants move for summary judgment for all the Counts in the Complaint. (ECF Nos. 179-82.)  The Court gave Plaintiff notice pursuant to *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998) (en banc), and *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988), that Defendants had filed a Motion for Summary Judgment which, if granted, under Rule 56 of the Federal Rules of Civil Procedure, could result in dismissal of the case.  (ECF No. 183.)  The Court ordered Plaintiff to respond and file his opposition by April 26, 2016, or, if he did not intend to oppose, to file his notice of non-opposition by that date.  (ECF No. 183.)  Plaintiff has failed to do either.

The Court, having carefully reviewed all the documents submitted by the Defendants, finds there is no genuine issue of material fact in this case.  For the following reasons, the Motions for Summary Judgment are **GRANTED** and judgment is entered in favor of the Defendants and against the Plaintiff.

## I.      STATEMENT OF FACTS

### A.      Undisputed Facts

On November 19, 2011, at approximately 12:50 p.m., San Diego Police Department ("SDPD") received a report of vandalism in progress at a laundry room in the Pacific Sands Motel, 4449 Ocean Blvd.  An unknown male, later identified as the plaintiff in this case, had reportedly locked the door to the laundry room and barricaded himself inside.  (Bailiff Decl. ¶ 2, ECF No. 179-5.)  The owner of the motel had unsuccessfully attempted to get Plaintiff to come out.  (*Id.*)  However, Plaintiff kicked out the back door of the laundry room and fled the scene.  (*Id.*)  Plaintiff was described "as appearing to be on something with large eyes as big as saucers." (*Id.*)

Shortly thereafter, SDPD dispatch received a second call of a burglary in progress at an apartment complex located at 628 Diamond St., not far from the Pacific Sands Motel.  (Whetstine Decl. Ex 1, ECF No. 179-12.)  The report indicated

someone was banging around in the laundry room and possibly destroying things. (*Id.*)

By the time police arrived on the scene, Plaintiff had broken through from the laundry room into two adjacent garages and barricaded himself inside the second garage.  (Bailiff Decl. ¶ 4; Widner Decl. ¶ 3, ECF No. 179-6; Reichner Decl. ¶ 4, ECF No. 179-19.)  Plaintiff appeared to be pounding on things in the garage and trying to break through the wall of the garage.[2]  (Bailiff Decl. ¶ 4.)

Police Officers Widner and Welsh entered the laundry room and saw that someone had broken through the dry wall in the laundry room and created a hole between the laundry room and the garage.  (Widner Decl. ¶ 4; Welsh Decl. ¶ 2, ECF No. 179-10.)  They also saw that Plaintiff had barricaded the hole he had created by placing numerous large heavy objects over the hole.  (Widner Decl. ¶ 6.)

Officer Widner called out to Plaintiff and told him to surrender or Officer Widner would send a police dog in to bite him.  (Widner Decl. ¶ 5; Welsh Decl. ¶ 4.)  He ordered Plaintiff repeatedly to come out.[3]  (Widner Decl. ¶ 6; Welsh Decl. ¶ 4; Reichner Decl. ¶ 5.)  When Plaintiff did not respond, Officer Widner sprayed pepper spray through the hole in the dry wall.  (Widner Decl. ¶ 6; Welsh Decl. ¶ 4.)

While Plaintiff was in the garage, several officers identified themselves as SDPD officers and ordered Plaintiff to come outside.[4]  (Bailiff Decl. ¶¶7, 10; Widner Decl. ¶ 6; Cummings Decl. ¶¶ 2, 5, ECF No. 179-7; Curran Decl. ¶ 5, ECF No. 179-

---

[2] Plaintiff admits kicking 5-6 holes in the dry wall. (Larson Dep. 14, ECF No. 179-4.)

[3] Officer Widner adds that Plaintiff responded, "Fuck you, I'll never come out!" and "I like my freedom. Why are you doing this?"  (Widner Decl. ¶ 5; *see also* Ruiz Decl. ¶ 2, ECF No. 179-9.)  Plaintiff does not "think [he] cursed, but he might have."  (Larson Dep. 23-24.)

[4] Plaintiff admits there were voices shouting at him to come out, but he appears uncertain as to whether they were police officers or not.  In his deposition, Plaintiff says first that when he was in the laundry room, he heard what he believed were cops saying come out.  (Larson Dep. 15.)  Later in the deposition, Plaintiff said he had no idea it was police until Officer Widner pepper sprayed him through the barricade he had built around the hole he had kicked in the garage.  (*Id.* at 17-18.)  And then further on in the deposition, Plaintiff said he did not know it was the police until they opened up the garage door.  (*Id.* at 27.)  In any case, Plaintiff submits no evidence contradicting the numerous reports affirming that the police identified themselves and yelled for Plaintiff to come out.  Larson only indicates that he did not hear this identification.  (*Id.* at 29.)

8; Ruiz Decl. ¶ 3; Welsh Decl. ¶ 6; Easter Decl. ¶¶ 2, 6, 8, ECF No. 179-13; Rao Decl. ¶ 5, ECF No. 179-17; Reichner Decl. ¶ 6.)  At some point, Plaintiff broke a gas line releasing gas into the area and forcing police to evacuate until the fire department could turn off the gas to the apartment complex.  (Bailiff Decl. ¶¶ 8-9; Widner Decl. ¶ 7; Cummings Decl. ¶ 4.)  Also, at some point, Plaintiff admits trying to crawl out of the garage through the ceiling drywall.  (Larson Dep. 28.)

Police had some difficulty opening the garage door to get Plaintiff out of the garage, in part because Plaintiff had jammed something into the door to prevent it from opening.  (Ruiz Decl. ¶ 5; Welsh Decl. ¶ 9.)  Thus, Officer Ruiz had to force the garage door open by hand.  (*Id.*)  Once the garage door was opened, Plaintiff was arrested.  During the arrest, he was hit by the arresting officers and tased in the right shoulder receiving contusions and abrasions.  He was also bitten by a police dog, resulting in "multiple linear scrapes consistent with teeth marks but no deeper lacerations."  (Jacobs Decl. ¶ 10, ECF No. 179-16; Bailiff Decl. ¶ 13.)  The dog bite was not through the skin and did not require sutures.  (Jacobs Decl. ¶ 10.)

Paramedics were called and Plaintiff was transported to Alvarado Hospital.  (Bailiff Decl. ¶ 18.)   The paramedics in the ambulance noticed Plaintiff had significant tachycardia with a heart rate of 140 or more, which is consistent with drug-induced excited delirium.  (Jacobs Decl. ¶ 8.)  At the emergency room, Plaintiff exhibited aggressive and bizarre behavior.  (*Id.* ¶ 10.)  He was restless, diaphoretic, agitated, and uncooperative.  (*Id.* ¶ 9.)  His IVs became disconnected because of his agitation.  (*Id.*)  He required two separate doses of Ativan and a dose of the anti-psychotic drug Geodon to calm him down.  (*Id.*)

Tests at the hospital show that Plaintiff exhibited elevated CPK, which is synonymous with rhabdomydiysis, which means skeletal muscle breakdown commonly associated with methamphetamine abuse.  (Jacobs Decl. ¶ 11.)  This is a condition that develops over hours, not minutes "and, therefore, had to have been present before [Plaintiff's] encounter with the police."  (*Id.*)

13cv2790

At the Hospital, American Forensic Nurse Leah Harden drew Plaintiff's blood.[5]   (Graham Decl. ¶ 2, ECF No. 179-14.)   Plaintiff tested positive for methamphetamine, opiates, and THC.  (Jacobs Decl. ¶ 12.)  His drug levels were almost six times that of normal drug-abuse level.  (*Id.*)  He exhibited extremely toxic levels of methamphetamine.  (*Id.* ¶ 7.)  His vital signs also showed an elevated temperature and heart rate.   (*Id.*)   Additional laboratory tests showed renal dysfunction and rhabdomyolysis.  (*Id.*)  All of this is consistent with Plaintiff's behavior including agitated delirium.  (*Id.* ¶ 12.)  Dr. Jacobs opines that individuals, such as Plaintiff, exhibiting agitated delirium, are "well known to exhibit almost superhuman strength."  (Jacobs Decl. ¶ 6.)

### B.   Disputed Facts

#### 1.   Plaintiff's Version of the Arrest[6]

Plaintiff claims he exited the garage with his hands up and walked straight out. (Larson Dep. 31-32.)  He said he was standing with his hands up when officers ran up to him and started hitting him.  (*Id.* at 33.)  Plaintiff testified officers knocked him to the ground where he remained in a fetal position without kicking, yelling, flailing, or struggling in any way.  (*Id.* at 36-37.)  However, he also was not putting his hands behind his back to be handcuffed.  (*Id.*)  Officers did tell him to stop resisting.  (*Id.* at 42.)  He did not understand this comment since he was not resisting.  (*Id.* at 43.) He did not understand the officers' reaction because he did not believe he had committed any crime at that point (although he admits breaking into the laundry room, breaking through to the garages, putting 5-6 holes in the dry wall, breaking a gas line and attempting to crawl through the ceiling drywall in the garage).  (*Id.* at

---

[5] Plaintiff "doesn't believe" anyone took his blood other than Officer Ruiz.  (Larson Dep. 76.) Officer Ruiz flatly denies that Officer Ruiz ever took Plaintiff's blood.  (Ruiz Decl. ¶¶ 15-16.)

[6] Although Plaintiff files no opposition to the Motions for Summary Judgment, the Court has culled the following version from Plaintiff's deposition submitted in support of Defendants' Motions.

13cv2790

14, 28.)

Plaintiff said the police dog did not bite him immediately, so Officer Widner picked up Plaintiff's leg and swung it across the dog's muzzle five times, each time resulting in a dog bite from the police dog. (Larson Dep. 51-57.) Each time he could hear the officers laughing and saying "good boy." (*Id.* at 57.) Plaintiff did not try to pull away from the dog or kick back. (*Id.* at 55.)

### 2.   All Others' Version of the Arrest

The officers and witnesses at the scene say otherwise. They claim Plaintiff came running out of the garage and charged the officers fists up "look[ing] like he was in a crazed state." (Bailiff Decl. ¶ 12; *see also* Widner Decl. ¶ 9; Cummings Decl. ¶ 7; Curran Decl. ¶ 7; Ruiz Decl. ¶ 6; Welsh Decl. ¶ 10; Reichner Decl. ¶ 9.) Plaintiff was screaming, appeared in a rage, and refused to comply with the officers' orders to get on the ground. (Bailiff Decl. ¶ 12; Welsh Decl. ¶ 11; Reichner Decl. ¶ 10.) Thus, Officer Widner released his police dog. (Widner Decl. ¶ 14; Cummings Decl. ¶ 8.) The dog took Plaintiff to the ground. (Widner Decl. ¶ 14.) Plaintiff responded by fighting with and kicking the dog. (*Id.*) The dog did not appear to have any effect on Plaintiff. (Curran Decl. ¶ 5; Ruiz Decl. ¶ 7.) Plaintiff also struggled and fought with the officers who were trying to get his hands behind his back so they could handcuff him. (Bailiff Decl. ¶ 14; Cummings Decl. ¶ 9; Curran Decl. ¶ 9; Ruiz Decl. ¶ 8; Welsh Decl. ¶ 12; Reichner Decl. ¶ 12.)

Officers repeatedly told Plaintiff to stop resisting and to put his hands behind his back but he refused to comply. (Bailiff Decl. ¶ 14; Curran Decl. ¶ 9; Ruiz Decl. ¶ 9.) Therefore, Officer Ruiz applied a carotid restraint on Plaintiff which worked temporarily and enabled the officers to get one handcuff on, but Plaintiff then resumed struggling and fighting. (Bailiff Decl. ¶¶ 14, 16; Cummings Decl. ¶ 10; Curran Decl. ¶¶ 9-10; Ruiz Decl. ¶ 8.)

//

Officer Ruiz thus deployed his taser to Plaintiff's shoulder and the officers were able to handcuff Plaintiff's other hand.  (Bailiff Decl. ¶ 17; Cummings Decl. ¶ 11; Curran Decl. ¶ 10; Ruiz Decl. ¶ 9.)  Once Plaintiff was handcuffed, he showed signs of excited delirium.  (Bailiff Decl. ¶ 18; Widner Decl. ¶ 16; Cummings Decl. ¶ 12; Curran Decl. ¶ 11.)  "His eyes were dilated, he was extremely sweaty, he was yelling irrational things, he was violently shaking and his body began to tense up." (Bailiff Decl. ¶ 18; Widner Decl. ¶ 16; Cummings Decl. ¶ 12; Curran Decl. ¶ 11; Ruiz Decl. ¶ 13.)  Hence, the officers called paramedics to the scene.  (Id.)

Officers did not pick up Plaintiff's leg and hit the police service dog with it. (Bailiff Decl. ¶ 20; Widner Decl. ¶ 18; Cummings Decl. ¶ 14; Curran Decl. ¶ 13; Ruiz Decl. ¶ 10; Welsh Decl. ¶ 16; Easter Decl. ¶ 13; Reichner Decl. ¶ 14.)  They were not laughing or saying "good boy" to the dog. (Bailiff Decl. ¶ 20; Widner Decl. ¶ 18; Cummings Decl. ¶ 14; Curran Decl. ¶ 13; Welsh Decl. ¶ 16; Easter Decl. ¶ 13; Reichner Decl. ¶ 14.)  No one hit Plaintiff once he was fully restrained.  (Id.)

### 3.    Plaintiff's Version of the Hospital

Plaintiff claims at the hospital Sgt. Bailiff, and Officers Ruiz and Widner had a discussion about how they had decided to use brutal force against him before they had even made contact with him.  (Larson Dep. 73-74.)  Plaintiff said they further discussed fabricating their reports and directing Widner not to write a report.  (*Id.* at 75.)

Plaintiff admits using marijuana earlier in the day of November 19. (Larson Dep. 78.)  Plaintiff admits that he has used methamphetamine approximately 2-3 times a month from the age of 20, but claims he last used methamphetamine eight months before his arrest. (*Id.*)  Plaintiff claims Officer Ruiz inserted the illegal drugs into his body intravenously on November 20, 2011, while he was at Alvarado Hospital.  (*Id.* at 76.)

### 4.      All Others' Version of the Hospital

Officer Ruiz requested that a lab technician draw Plaintiff's blood as evidence. (Ruiz Decl. ¶15.)  He witnessed American Forensic Nurse phlebotomist Leah Harden take Plaintiff's blood.  (*Id.*)  He impounded the two vials of blood taken by Ms. Harden for testing.  (*Id.*)  He denies sticking Plaintiff with a needle or syringe, drawing Plaintiff's blood at any time or injecting Plaintiff with any illegal drugs. (Ruiz Decl. ¶ 16.)

The officers did not discuss the manner of taking Plaintiff into custody nor the use of force against Plaintiff either before or after the arrest.  (Bailiff Decl. ¶¶ 6, 22; Widner Decl. ¶¶ 8, 20; Cummings Decl. ¶¶ 3, 16; Curran Decl. ¶¶ 3, 15; Ruiz Decl. ¶¶ 3, 20.)  The officers did not discuss manufacturing false reports and indicate their police reports are all true.  (Bailiff Decl. ¶ 23; Widner Decl. ¶¶ 1, 21; Cummings Decl. ¶ 17; Curran Decl. ¶ 16; Ruiz Decl. ¶ 21.)   In fact, Sgt. Bailiff and Officers Widner, Cummings and Curran all deny even ever being at the hospital where these conversations allegedly took place.   (Widner Decl. ¶ 20; Bailiff Decl. ¶ 22; Cummings Decl. ¶ 16; Curran Decl. ¶ 15; Ruiz Decl. ¶ 19.)

## II.   LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways:  (1) by presenting evidence

that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322-23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact. *Kennan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995)). If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252). Rather, the nonmoving party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence,

13cv2790

and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.  However, the Ninth Circuit "has refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (citing *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996); *Johnson v. Washington Metro. Transit Auth.*, 883 F.2d 125, 128 (D.C. Cir. 1989) (discussing cases in which self-serving testimony uncorroborated by other evidence did not create a genuine issue of material fact)).

A district court may not grant a motion for summary judgment solely because the opposing party has failed to file an opposition.  *Cristobal v. Siegel*, 26 F.3d 1488, 1494-95 & n.4 (9th Cir. 1994).  The court may, however, grant an unopposed motion for summary judgment if the moving party's papers are themselves sufficient to support the motion and do not on their face reveal a genuine issue of material fact. *See Carmen*, 237 F.3d at 1029.

Furthermore, where a plaintiff appears *pro se* in a civil-rights case, the court must construe the pleadings liberally and afford the plaintiff the benefit of the doubt. *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988).  This rule is not limited to complaints or pleadings.  The Ninth Circuit has extended this maxim to include *pro se* filings as well.  *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010).   The rule of liberal construction is "particularly important in civil rights cases."  *Ferdik v. Bonzelet*, 963 F.2d 1258, 1281 (9th Cir. 1992).

## III.   DISCUSSION

### A.   Section 1983 Excessive Force and Torture during November 19, 2011 Arrest (Counts One, Five, Twelve and Fourteen)

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality

of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks and citation omitted). A court must first consider the nature and quality of the intrusion, evaluating the type and amount of force inflicted. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (citing *Deorle v. Rutherford*, 272 F.3d 1272, 1279-80 (9th Cir. 2001); *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994). Next, the court must determine the government's interest at stake in the use of force, weighing factors "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Matthos*, 661 F.3d at 441 (citing *Deorle*, 272 F.3d at 1279-80). "These factors, however, are not exclusive. Rather, [courts should] examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)).

The reasonableness of a particular use of force requires taking the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The right to make an arrest carries with it the right to employ some level of force to effect it." *Bryan*, 630 F.3d at 828 (citing *Graham*, 490 U.S. at 396). Thus, a "court must consider that the officer may be reacting to a dynamic and evolving situation, requiring the officer to make split-second decisions." *Id.* (citing *Graham*, 490 U.S. at 396-97). "[A]n officer need not have perfect judgment, nor must he resort only to the least amount of force necessary to accomplish legitimate law enforcement objectives." *Id.*

Because the excessive force inquiry ordinarily "requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," the Ninth Circuit has emphasized that "summary judgment . . . in excessive force cases should be

granted sparingly." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (citing *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)); *see also Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) ("Where the objective reasonableness of an officer's conduct turns on disputed issues of material fact, it is a question of fact best resolved by a jury.")  However, at the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether or not an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007); *see also Torres*, 648 F.3d at 1123.

### 1. Nature and Quality of the Intrusion

A court measures the gravity of the particular intrusion that a given use of force imposes upon an individual's liberty interest with reference to "the type and amount of force inflicted." *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (quoting *Deorle*, 272 F.3d at 1279).  Neither party disputes that Officer Widner released his police dog and that the dog bit Plaintiff resulting in "multiple linear scrapes consistent with teeth marks but no deeper lacerations."  Neither party disputes that Officer Ruiz deployed a taser to Plaintiff's shoulder.  And neither party disputes that Officer Cummings struck Plaintiff multiple times during the course of the arrest.

Although there are disputes about what, exactly, Officer Curran and Sgt. Bailiff did to injure Plaintiff, the Court, in an attempt to give Plaintiff every benefit of the doubt, will assume for the purposes of Summary Judgment that Bailiff and Curran also injured Plaintiff in some fashion during the arrest.  The dog bites, the punches and the tasing are a serious intrusion on Plaintiff's liberty interests.  The Court therefore turns to examine whether indisputable facts support the existence of a governmental interest in using such force that outweighs the intrusion on Plaintiff's liberty interest.

### 2.   Government's Interest in the Use of Force

To measure the government's interest in the use of force, courts look at the totality of the circumstances, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  Of these three factors, "the most important is whether the individual posed an immediate threat to [the officer[s] or public safety." *Young*, 655 F.3d at 1163 (citing *Smith*, 394 F.3d at 702).

### a.   Severity of the Crime

At the time officers attempted to arrest Plaintiff, he had broken into two residences, caused considerable destruction and caused a gas leak, requiring evacuation of the area. His behavior was unpredictable and his criminal conduct continuing.  The officers had a strong interest in getting him into custody before he inflicted more damage or injury to another.

### b.   Immediate Threat

"[A] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle*, 272 F.3d at 1281.  Moreover, "[a] desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury.  There must be other significant circumstances that warrant the use of such a degree of force at the time it is used." *Id.* at 1281; *see also Bryan v. MacPherson*, 630 F.3d at 826.

Clearly, if the officers' statements are given credence, Plaintiff's behavior as he exited the garage gave the Officers objective cause to fear for their safety.  However, Plaintiff denies fighting in any way as he exited the garage.  Therefore, for

the purposes of Summary Judgment, the Court gives credence to Plaintiff's description of his behavior and instead looks at the facts that are undisputed at the time of the arrest.

At the time the garage door opened and Plaintiff came out, the officers indisputably had the following information: (1) Plaintiff had broken into one, possibly two, residences; (2) It was likely the individual exiting the garage was the same one who was described by the Pacific Sands Motel manager as "on something with large eyes as big as saucers"; (3) Plaintiff's actions in the residence were erratic and irrational:  he broke into a laundry room and proceeded to kick several holes in the dry wall from the laundry room into two garages; (4) There was probable cause to believe Plaintiff had committed the offenses of burglary and vandalism; (5) Plaintiff refused to respond to repeated calls to come out of the garage;  (6) Plaintiff had failed to respond to pepper spray sprayed into the hole he had made in the dry wall; (7) Plaintiff had barricaded himself in the garage—both by stacking heavy objects against the hole he had created in the drywall and by jamming some object into the garage door so it would not open without force; and (8) Plaintiff had already caused a gas leak in the building, which had led to a severe safety risk and forced evacuation of the immediate area.

Therefore, at the time the garage door was opened, it appeared that Plaintiff had committed crimes, the total severity of which was unknown, that Plaintiff was under the influence of something.  Police had no idea whether Plaintiff was armed or not but they did know that Plaintiff was not prepared to surrender without a fight and was actively resisting arrest.

Even if all the officers are to be disbelieved and Plaintiff's self-serving, uncorroborated testimony is to be believed, and Plaintiff did not charge at and fight off the officers as he left the garage, he certainly did not cooperate by putting his hands behind his back to be handcuffed.  From a reasonable, objective officer's perspective, Plaintiff posed a serious immediate threat.

### c.     Attempts to Evade or Flee Arrest

As discussed above, Plaintiff clearly resisted the Officers attempts to get him out of the garage to arrest him.  The inquiry, however, must go beyond merely determining whether Plaintiff resisted arrest, to determining whether the amount of force used by the officers to subdue Plaintiff was reasonable given the totality of the circumstances.  *See LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000) (finding that although defendant resisted arrest, if the injury to the arrestee is serious enough, a jury could conclude that the arresting officer used force in excess of what was reasonable); *see also Luchtel v. Hagemann*, 623 F.3d 975, 987-88 (9th Cir. 2010) ("The relevant inquiry is not whether the force the officers used was no greater than that required to overcome [an arrestee's] resistance . . . .  [I]t is whether the force used was reasonable in light of all the relevant circumstances." (internal quotation marks and citation omitted)).

Even "purely passive resistance can support the use of some force." *Gravelet-Bondin v. Shelton*, 728 F.3d 1086, 1091 (9th Cir. 2013) (quotation omitted).  However, "the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Id.*

In this case, Plaintiff did more than passively resist arrest.  He kicked five or six holes in the dry wall of a private individual's residence trying to escape.  He broke things in the residential garage and barricaded himself inside.  He refused to respond to officers' calls to come out, threats to send in a police dog and pepper spray.  He broke a gas line forcing the evacuation of the area and he tried to crawl out of the garage through the ceiling drywall.   This factor also weighs in favor of the government.

### d.     Additional Factors

The Ninth Circuit also recognizes other factors that may be considered in the

*Graham* analysis, including the availability of alternative methods of capturing or subduing a suspect. *Smith*, 394 F.3d at 701.  In the Ninth Circuit it is a "settled principle that police officers need not employ the 'least intrusive' degree of force." *Bryan*, 630 F.3d at 831, n.15.  However, "if there were clear, reasonable and less intrusive alternatives to the force employed, that militates against finding the use of force reasonable." *Glenn v. Wash. Cnty.*, 673 F.3d 864, 876 (9th Cir. 2011) (internal citations and quotations omitted).

In *Lindsay v, Kiernan*, the Ninth Circuit found that "[g]iven the volatile situation, [the plaintiff]'s refusal to comply with any of the officer's verbal commands, and his physical resistance despite the presence of multiple officers, [the defendant] could have reasonably believed that deploying his taser after a warning would be the least intrusive method of subduing [the plaintiff]."  378 F. App'x 606, 609 (9th Cir. 2010) (not for publication).  In *Gregory v. Co. of Maui*, in determining no excessive force was used, the Ninth Circuit found relevant the fact that officers did not immediately engage in a physical confrontation with a "high strung, excitable and jumpy" man possibly high on drugs, even where they "had substantial grounds for believing the some degree of force was necessary" in effecting the arrest.  523 F.3d 1103, 1106-07 (9th Cir. 2008).

Here, the Officers attempted to get Plaintiff to exit the building peacefully, warning him that he would be bit by a police dog if he did not.  They then attempted the less intrusive force of spraying pepper spray but this had no effect on Plaintiff.  He continued to break things in the garage, barricade himself inside which required the officers to force the garage door open.  At that point, the Officers used the least intrusive force possible:  fists, a single taser shot and a police dog who did no more than linearly scrape Plaintiff's skin.  They did not use guns.  They did not use batons or flashlights, and, as a result, Plaintiff was not critically injured despite his heavy intoxication, irrational behavior and refusal to cooperate.  The officers' use of force was not excessive.

### 3.    Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   Qualified immunity shields an officer from liability even if his or her actions resulted from "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).   The purpose of qualified immunity is to strike a balance between the competing "need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* The driving force behind creation of the qualified immunity doctrine was a resolution to resolve unwarranted claims against government officials at the earliest possible stage of litigation. *Pearson*, 555 U.S. at 231.

An officer is entitled to qualified immunity as long as the officer's actions "could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (citing Malley v. Briggs, 475 U.S. 335, 341 (1981)) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law.")   Thus, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . in light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640.   If an officer is found to use excessive force, but the Court finds the officer made a reasonable mistake as to the legality of his actions, he is entitled to qualified immunity. *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001).

//

In this case, even if the force used by the Defendants was excessive, the officers reasonably believed, based on all the facts previously discussed, that Plaintiff would not surrender and posed a risk to the officers or others.  Therefore, based on all the circumstances of the case, the Defendants are entitled to qualified immunity.

Since the Court finds Defendants did not use excessive force when they arrested Plaintiff on November 19th, and further finds Defendants are entitled to qualified immunity, the Court **GRANTS** Defendants' Motions for Summary Judgment on Counts One, Five, Twelve and Fourteen.

## B.    Section 1983 Excessive Force and Torture during November 20, 2011 Hospitalization (Counts Three and Seven)

Officer Ruiz offers an uncontroverted declaration that, on November 19, 2011, he requested that a lab technician draw Plaintiff's blood as evidence.[7]  (Ruiz Decl. ¶ 15.)  Officer Ruiz witnessed phlebotomist Leah Harden take Plaintiff's blood. (*Id.*)  He impounded the two vials of blood for testing.  (*Id.*)  This testimony is supported by the Declaration of Nikhol Graham, who states that, in fact, documents from the American Forensic Nurses, confirm that phlebotomist Leah Harden drew Plaintiff's blood on November 19, 2011.  (ECF 179-14 ¶¶ 2-4.)

Ruiz denies injecting illegal drugs into Plaintiff's blood at any time, and, in particular on November 20, 2011. (Ruiz Decl. ¶ 16.)  Although Plaintiff's deposition testimony, submitted by Defendants in their Motions, contradicts this statement, Plaintiff simply makes a bald statement that Officer Ruiz inserted illegal drugs into his body intravenously on November 20, 2011, while he was at Alvarado Hospital. (Larson Dep. 76.)    Larson additionally testifies that, although he has used methamphetamine 2-3 times a month since he was 20 years old, he had not used methamphetamine since March 18, 2011 (eight months before the arrest).  (Larson

---

[7] Plaintiff only testifies that he "doesn't believe" anyone took his blood other than Officer Ruiz.  (Larson Dep. 26.)

13cv2790

Dep. 78.)  The Court need not accept this uncorroborated, self-serving testimony, that is so undermined as to be incredible.

Dr. Jacobs, interpreting the paramedic and hospital records, points out that Plaintiff exhibited symptoms of methamphetamine abuse that reflect introduction of the methamphetamine into his system hours before his encounter with the police. (Jacobs Decl. ¶ 11.)  Plaintiff's heart rate, behavior, temperature, renal dysfunction and ultimately lab test results, confirmed that the illegal drugs in Plaintiff's system— that is opiates, THC and extremely toxic levels of methamphetamine, were in Plaintiff's system before Plaintiff's hospitalization on November 20th, and thus were not injected by any officer visiting the hospital.

There is no genuine issue of material fact on this issue, and thus no reasonable jury could return a verdict in Plaintiff's favor.  Defendant's Motion for Summary Judgment on Counts Three and Seven is **GRANTED**.

## C.     Section 1983 Due Process Claims under the Fourteenth Amendment (Counts Two, Four, Six, Eight, Thirteen and Fifteen)

Plaintiff alleges six counts of violations under the due process clause of the Fourteenth Amendment—Counts 2, 4, 6, 8, 13, and 15 asserted in the complaint.  In *Graham*, the Supreme Court held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."  *Graham*, 490 U.S. at 395.  Plaintiff's claims all arise from force used against him in the course of being arrested, therefore, his seizure exclusively implicates the Fourth Amendment.  *See Ward v. City of San Jose*, 967 F.2d 280, 285 (9th Cir. 1991) ("It is reversible error to give a substantive due process instruction in an excessive force case after Graham."); *Eberle v. City of Anaheim*, 901 F.2d 814, 820 (9th Cir. 1990).  Accordingly Defendants' Motions for Summary Judgment on

the Second, Fourth, Sixth, Eighth, Thirteenth and Fifteenth causes of action are **GRANTED**.

### D.   Conspiracy (Counts Nine and Ten)

In Counts Nine and Ten, Plaintiff alleges the Defendants conspired to use excessive force against him.  In Count Nine he alleges the officers conspired to use excessive force at his arrest on November 19th, and in Count Ten, he alleges Officer Ruiz conspired (with unnamed individuals) to intravenously intoxicate him at the hospital on November 20th.  For an actionable conspiracy claim, Plaintiff must establish: (1) the existence of an agreement (express or implied) to deprive him of constitutional rights, and (2) actual deprivation of those rights arising from that agreement.  *Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir. 1991).

In this case, Plaintiff fails to put forth evidence of either. He provides no evidence to counter the officers' declarations that no such agreement existed. (*See* Bailiff Decl. ¶¶ 6, 22; Widner Decl. ¶¶ 8, 20; Cummings Decl. ¶¶ 3, 16; Curran Decl. ¶¶ 3, 15; Ruiz Decl. ¶¶ 3, 20.)  And, as discussed above, he fails to provide evidence that excessive force was actually used against him.  Therefore, the conspiracy allegations must also fail.  *See Cassetteri v. Nevada Co. Cal.*, 824 F.2d 735, 739 (9th Cir. 1987) (insufficiency of § 1983 allegations precludes a conspiracy claim predicated on those same allegations).

Therefore, Defendants' Motions for Summary Judgment as to Counts Nine and Ten are **GRANTED**.

### E.   Fabrication of Police Reports (Counts Eleven and Sixteen)

Plaintiff alleges the Defendants fabricated police reports in violation of the Fourth Amendment prohibition against unreasonable seizures.  The Defendants all offer declarations that they did not fabricate police reports and that all of their police reports are true.  (Bailiff Decl. ¶ 23; Widner Decl. ¶¶ 1, 21; Cummings Decl. ¶ 17;

Curran Decl. ¶ 16; Ruiz Decl. ¶ 21.)  Plaintiff offers no evidence to contradict these declarations, nor does he indicate what in the police reports was allegedly fabricated. The only evidence apparent from Plaintiff's Deposition is his testimony that, while he was in Alvarado Hospital, he overheard Sgt. Bailiff, and Officers Ruiz and Widner discussing fabricating their reports.  (Larson Dep. 75.)  Sgt. Bailiff and Officer Widner deny even being at the hospital where these conversations allegedly took place.  (Widner Decl. ¶ 20; Bailiff Decl. ¶ 22; Ruiz Decl. ¶ 19.)

Plaintiff's Deposition testimony, without more, is insufficient to raise a genuine issue of material fact.  Plaintiff fails to even explain what he believes was fabricated in the reports.  He fails to designate any specific facts showing a genuine issue for trial.  Even assuming his allegations of overheard conversations at the Hospital are true, an incredible stretch of the imagination, this still constitutes insufficient evidence to support his allegations.  Hence, Defendants' Motions for Summary Judgment on Counts Eleven and Sixteen are **GRANTED**.

## IV.    CONCLUSION & ORDER

In light of the foregoing, Defendants' Motions for Summary Judgment are **GRANTED** in their entirety.  (ECF Nos. 179, 180, 181, 182.)  Judgment is entered in favor of Defendants and against the Plaintiff.

**IT IS SO ORDERED.**

**DATED:  July 14, 2016**

Hon. Cynthia Bashant
United States District Judge

13cv2790